[Cite as *State v. Kalonji*, 2016-Ohio-991.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PAULDING COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  11-15-07

    v.

JEAN-PAUL B. KALONJI,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Paulding County Court
Trial Court No. 15-TRD-1714

Judgment Affirmed

Date of Decision:  March 14, 2016

APPEARANCES:

    *Jean-Paul B. Kalonji*, Appellant

    *Matthew A. Miller* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Jean-Paul B. Kalonji ("Kalonji"), pro se, appeals the September 23, 2015 judgment entry of sentence of the Paulding County Court. He argues that his speeding conviction is based on insufficient evidence and against the manifest weight of the evidence and that the trial court erred by allowing certain evidence. For the reasons that follow, we affirm.

{¶2} This case stems from a July 4, 2015 traffic stop, in which Ohio State Highway Patrol Sergeant Michael McClain ("McClain") stopped Kalonji for travelling 76 miles per hour in a 65-miles-per-hour zone on U.S. Route 24 in Paulding County. (*See* Doc. No. 1). Kalonji's speed was determined by Ohio State Highway Patrol Trooper Scott Hartge ("Hartge"), who was piloting an Ohio State Highway Patrol aircraft and checking the speeds of motorists travelling in the eastbound lanes of U.S. Route 24. (*See* Doc. No. 1); (Aug. 26, 2015 Tr. at 9-11).

{¶3} Kalonji was issued a citation for speeding in violation of R.C. 4511.21(D)(3), and the citation was filed in the trial court on July 7, 2015. (Doc. No. 1). On July 13, 2015, Kalonji pled not guilty to the charge. (July 13, 2015 Tr. at 3). The case proceeded to a bench trial on August 26, 2015. (Aug. 26, 2015 Tr. at 2). At the conclusion of the trial, the trial court took the case under advisement. (*Id.* at 62). On September 23, 2015, the trial court issued the judgment entry that

is the subject of this appeal. (Doc. No. 8). In it, the trial court found Kalonji guilty of speeding as charged in the citation and ordered that he pay a $43 fine and $122 in court costs. (*Id.*).

{¶4} On October 21, 2015, Kalonji filed a notice of appeal. (Doc. No. 9). He raises five assignments of error for our review. We consider together the first and fifth assignments first. We will then address together his second, third, and fourth assignments of error.

### Assignment of Error No. I

**The trial court erred in denying the appellant [sic] motion to dismiss the charge.**

### Assignment of Error No. V

**The trial court erred in granting a verdict guilty [sic] against the Appellant.**

{¶5} In his first assignment of error, Kalonji appears to argue that his conviction is based on insufficient evidence. In his fifth assignment of error, Kalonji appears to argue that his conviction is against the manifest weight of the evidence. Kalonji argues:

> that the Pilot trooper did not provide to the Court any proof, stop watches, calibration documentations of his equipment, his plane speed and altitude, direction, distance from the alleged speeding vehicle of his aerial observations and that the amount of calculations

and citations given for other vehicles were not consistent with the interval of time humanly possible.

(Appellant's Brief at 7). Kalonji also argues "that it was not humanly possible or normal to remember * * * details" "such as the color of this one vehicle and the one next to it * * * considering how busy traffic was on that holiday, the number of citations issued and that the details were obtained prior to coming to court for preparation." (*Id.* at 8).

{¶6} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn.4. Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505,

2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶7} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶8} Kalonji was convicted of speeding in violation of R.C. 4511.21(D)(3), which provides, in relevant part: "No person shall operate a motor vehicle * * *

upon a street or highway as follows: * * * At a speed exceeding sixty-five miles per hour upon an expressway as provided in division (B)(13) * * * of this section * * *."[1] In addition to these statutory elements, the prosecution is required to prove identity—that is, that the defendant is the person who actually committed the offense at issue. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13. In this appeal, Kalonji appears to dispute only two elements of the offense. First, Kalonji disputes the identity element of the offense, arguing that the officers could not have properly identified his vehicle. Second, Kalonji disputes the "speed exceeding sixty-five miles per hour" element of the offense. Therefore, these are the only elements we will address in our sufficiency-of-the-evidence and manifest-weight-of-the-evidence analyses. *See Missler* at ¶ 13.

{¶9} At trial, the State presented the testimony of Ohio State Highway Patrolmen Hartge and McClain. Hartge is a pilot assigned to the aviation section of the Ohio State Highway Patrol. (Aug. 26, 2015 Tr. at 5). On July 4, 2015, he was operating a marked Ohio State Highway Patrol aircraft patrolling the U.S. Route 24 eastbound air speed zone at mile post 18 in Paulding County. (*Id.* at 7,

---

[1] R.C. 4511.21(B)(13) provides: "It is prima-facie lawful, in the absence of a lower limit declared or established pursuant to this section by the director of transportation or local authorities, for the operator of a motor vehicle * * * to operate the same at a speed not exceeding the following: * * * Sixty-five miles per hour for operators of any motor vehicle at all times on all rural expressways without traffic control signals * * *." "'Expressway' means a divided arterial highway for through traffic with full or partial control of access with an excess of fifty per cent of all crossroads separated in grade." R.C. 4511.01(ZZ). "'Rural' means outside urbanized areas, as designated in accordance with 23 U.S.C. 101, and outside of a business or urban district." R.C. 4511.21(O)(5). Kalonji does not dispute that he was operating his motor vehicle "upon an expressway as provided in" R.C. 4511.21(B)(13).

9). According to Hartge, the air speed zone is one mile long and consists of five white lines painted onto the berm on each side of the road. (*Id.* at 7, 33). The five white lines are 1,320 feet—or one quarter mile—apart. (*Id.*). Hartge explained that, from the aircraft, he is able to determine the speed of a vehicle travelling on a highway using electronic stopwatches. (*Id.*). Hartge testified that he starts the stopwatch as the vehicle's front bumper crosses the first white line, that he clicks the lap button on the stopwatch as the vehicle's front bumper crosses the next three white lines, and that he stops the stopwatch as the vehicle's front bumper crosses the final white line. (*Id.* at 7-8). The stopwatch calculates the speed in miles per hour for each quarter-mile segment. (*Id.* at 8).

{¶10} According to Hartge, the Ohio State Highway Patrol has a procedure to check the stopwatches for accuracy and proper operation. (*Id.*). Each month, they "run a calibration check through the National Institute of Standards and Technology F1CC and Clock which is based near Boulder Colorado," during which they "listen to a radio station which is broadcast from there * * * that * * * broadcasts a tone * * * every minute" and "run the watches for a two minute time period against that." (*Id.*). According to Hartge, a stopwatch "must be within one tenth of a second" of the broadcasted tones, or else it is taken out of service. (*Id.*). Hartge testified that, on June 15, 2015 and July 15, 2015, he performed this calibration check on the stopwatches that he was using on July 4, 2015. (*Id.* at

12). In each of those checks, the stopwatches "were working properly also on those dates." (*Id.*). Hartge also explained the procedure for checking stopwatches before using them on any particular day:

> [B]efore and after any enforcement action is taken for any particular day, the watches are run simultaneously. I'll start both watches and stop them at the same time for approximately a sixteen second interval. And the watches must be within one tenth of a second of each other or both would be taken out of service if that would occur until it's determined which one is malfunctioning. At that point we check to make sure that the math part of the watch is properly converting the elapsed time into speed ah, by looking at our mile per hour conversion chart which shows * * * an exact speed in a thousandth mile per hour for that sixteen second interval. And ah, that's what we do twice a day, at the end and at the beginning of our shift.

(*Id.* at 8-9). Hartge testified that, on the day of the traffic stop in this case, he performed this procedure to check the stopwatches at 9:45 AM—before his shift—and at approximately 5:30 PM—at the end of his shift. (*Id.* at 12).

{¶11} Hartge testified that, as he was patrolling the U.S. Route 24 air speed zone on July 4, 2015, he was operating the aircraft at an approximate altitude of

2,900 feet, that there were no clouds between his aircraft and the ground, and that the visibility was at least five miles. (*Id.* at 11-12). According to Hartge, at 10:54 AM that day, he noticed a dark vehicle approaching the air speed zone that was traveling approximately 10 miles per hour over the posted speed limit of 65 miles per hour. (*Id.* at 9-10). Hartge testified that he checked the vehicle's speed:

I checked that vehicle at * * * 76.53 miles per hour in the first quarter with a lapsed time of 11.76 seconds. In the second quarter seventy five (75) miles per hour exactly with a lapsed time of 11.99 seconds, 76.07 miles per hour in the third quarter with a lapsed time of 11.83 seconds and back down to 75.1 mile [sic] per hour with lapsed time of 11.98 seconds.

(*Id.* at 10). Hartge explained how the stopwatch calculates the speed in miles per hour using a simple distance/time equation:

[B]asically what the watch does is for each quarter which is thirteen hundred and twenty (1320) feet to get feet per second you merely divide the elapsed time for the quarter mile for each check into the thirteen hundred and twenty (1320) feet so for the first quarter it was 11.76 seconds. Now taking out a feet per second um, 112.2, so it's merely math there's thirty six hundred (3600) ah, seconds in an hour and five thousand two hundred and eighty (5280) feet in a mile so in

order to calculate that out to miles per hour you just multiply that times thirty six hundred (3600) and then divide that by five thousand two hundred eighty (5280) and that equals 76.53 miles per hour.

(*Id.* at 13).[2] Hartge testified that he is convinced beyond a reasonable doubt of the accuracy of the vehicle's speed as he measured it that day. (*Id.* at 14-15).

{¶12} According to Hartge, the vehicle "used both lanes to pass a silver car while it was in the airspeed zone." (*Id.* at 10). Hartge testified that he kept his eyes on the vehicle and instructed McClain—who was parked just beyond the air speed zone—to flag the vehicle over for going 76 miles per hour in a 65-miles-per-hour zone. (*Id.* at 10-11). According to Hartge, McClain stood outside his patrol vehicle and motioned the vehicle over, and Hartge "watched that vehicle * * * pull over as he flagged it over to the side of the road." (*Id.* at 10-11, 35). Hartge then verified with McClain that McClain flagged over the correct vehicle for traveling 76 miles per hour. (*Id.*). Hartge testified that McClain flagged over the correct vehicle. (*Id.* at 16).

---

[2] Hartge began to demonstrate the mathematical calculation for the other three quarter-mile checks; however, Kalonji interjected, "Your honor, we can skip I understand the concept, we can skip, he doesn't have to go through all of it." (Aug. 26, 2015 Tr. at 13-14).

{¶13} The State also presented the testimony of McClain. (*Id.* at 39). He testified that, on July 4, 2015,[3] he and other troopers, along with Hartge, were working the air speed zone on U.S. Route 24. (*Id.* at 42). McClain testified that he measured—with a laser measuring device—the distance between the white lines in the air speed zone and that the distance between each line is 1320 feet. (*Id.* at 47). According to McClain, Hartge informed him via radio of a dark vehicle in the air speed zone that was traveling at 76 miles per hour. (*Id.* at 43). McClain testified that Hartge followed the dark vehicle in his aircraft beyond the air speed zone to McClain's stationary position on County Road 143, at its intersection with U.S. Route 24. (*Id.*). McClain exited his patrol vehicle and flagged the dark vehicle over to the berm. (*Id.*). The dark vehicle, which was a black 2015 Chrysler minivan, pulled over, and McClain pulled up behind it in his patrol vehicle. (*Id.* at 42-43). McClain testified that he confirmed with Hartge that McClain flagged over the correct vehicle. (*Id.* at 47). McClain identified Kalonji as the operator of the minivan. (*Id.* at 42-43). The State played the video of McClain's stop of Kalonji, taken from the patrol vehicle that McClain was

---

[3] The trial court's judgment entry contains purported findings of fact, one of which erroneously states that McClain "testified that on *August 26, 2015* he was working on U.S. 24 in Paulding County with the Highway Patrol Air Division and working specifically with Pilot Hartage [sic]." (Emphasis added.) (Doc. No. 8). Crim.R. 23(C) provides, "In a case tried without a jury the court shall make a general finding." "[A]ny purported findings of fact by the trial court are 'mere surplusage without legal significance.'" *State v. Ham*, 3d Dist. Wyandot No. 16-09-01, 2009-Ohio-3822, ¶ 37, quoting *State v. Crawford*, 10th Dist. Franklin No. 85AP-324, 1986 WL 1715, *7 (Feb. 6, 1986). Because the trial court's purported findings of fact are mere surplusage, the trial court's use of an erroneous date—August 26, 2015 rather than July 4, 2015—has no bearing on our disposition of this appeal.

operating. (*Id.* at 43-46). According to McClain, he informed Kalonji that the pilot determined Kalonji's speed to be 76 miles per hour in a 65-miles-per-hour zone. (*Id.* at 48). Based on that calculation, McClain issued a citation to Kalonji. (*Id.*). McClain did not himself clock Kalonji's speed. (*Id.*).

{¶14} We first review the sufficiency of the evidence supporting Kalonji's speeding conviction. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). First, concerning the element of identity, Hartge testified that he noticed a dark vehicle traveling in excess of the speed limit. There was nothing obstructing Hartge's view of the dark vehicle. He watched the vehicle use both lanes to pass a silver vehicle in the air speed zone, instructed McClain to flag the dark vehicle over, watched the dark vehicle pull over as McClain flagged it over, and confirmed with McClain that he flagged over the correct vehicle. McClain also testified that he confirmed with Hartge that McClain flagged over the correct vehicle. McClain identified Kalonji as the operator of that vehicle. The testimony of Hartge and McClain is sufficient evidence to support the identity element of Kalonji's speeding offense. *See State v. Makuch*, 5th Dist. Ashland No. 11-COA-048, 2012-Ohio-5272, ¶ 25.

{¶15} Second, concerning whether Kalonji exceeded the 65-miles-per-hour speed limit, McClain testified that he measured the distances between the white

lines in the air speed zone and that the distance between each line is 1320 feet, or one quarter mile. Hartge testified to the procedures used to test the stopwatches and to the accuracy of the stopwatches that he was using on July 4, 2015. Hartge observed Kalonji's vehicle without obstruction and timed it as it passed through each quarter mile of the air speed zone. Hartge recorded the elapsed times and speeds for each quarter mile. In two of the quarter-mile sections, Kalonji's speed exceeded 76 miles per hour. Hartge testified to the elapsed times in each quarter mile and to the simple distance/time calculations of Kalonji's speed in each quarter mile. In fact, as Hartge was demonstrating the longhand calculations, Kalonji acknowledged that he understood the mathematical formula and stated that Hartge could cease his mathematical explanation after he performed the longhand calculation of Kalonji's speed in the first quarter mile.

{¶16} The testimony of Hartge and McClain is sufficient evidence to support the "speed exceeding sixty-five miles per hour" element of the offense. *See Makuch* at ¶ 26-27; *State v. Osting*, 3d Dist. Crawford No. 3-86-21, 1988 WL 68698, *3-4 (June 27, 1988). Kalonji cites no authority suggesting that an officer who determined a motorist's speed from an aircraft using stopwatches must bring to court those stopwatches, calibration documents, and flight data. We found no authority standing for that proposition. Instead, we found ample authority for the proposition that a pilot-officer's testimony alone concerning the calibration and

accuracy of stopwatches and concerning the simple distance/time calculation to determine speed is sufficient evidence to support a speeding conviction. *See Makuch* at ¶ 26-27; *Osting* at *3-4; *State v. Barnes*, 3d Dist. Auglaize No. 2-09-23, 2010-Ohio-987, ¶ 12-21; *State v. Rice*, 2d Dist. Clark No. 2000CA5, 2000 WL 1369924, *4 (Sept. 22, 2000). *See also State v. Stockinger*, 6th Dist. Erie No. E-87-17, 1987 WL 27589, *2-3 (Dec. 11, 1987) ("The courts in Ohio have recognized that the use of a stopwatch in an airplane is an appropriate 'mechanical device' to measure speed."), citing *State v. Kelm*, 29 Ohio App.3d 317, 318 (12th Dist.1986).

{¶17} We next examine the manifest weight of the evidence. During Kalonji's cross-examination of Hartge, Hartge admitted that he brought only his notes to the trial and did not bring his stopwatches. (Aug. 26, 2016 Tr. at 19). Hartge testified that he checked to make sure that the stopwatches properly calculated the miles per hour in the instance of the dark vehicle that he had McClain flag over. (*Id.*). According to Hartge, he carries "a mile per hour conversion chart" in his aircraft that "shows an exact speed in a thousandth of a mile per hour for that sixteen (16) second interval and both watches * * * showed the exact speed in a thousandth of a mile per hour for that elapsed time." (*Id.*). Because the stopwatches automatically calculate miles per hour, Hartge does not need to make that calculation, but he did perform the longhand calculation

"separately for Court." (*Id.* at 21). Hartge clarified that he does not calibrate the stopwatches; he makes sure they are working properly, per his direct-examination testimony. (*Id.* at 20).

{¶18} Hartge testified that in the 10-minute window before and after Kalonji was stopped—5 minutes before and 5 minutes after—Hartge checked three vehicles, including Kalonji's. (*Id.* at 29). In the 15 minutes before and the 15 minutes after Kalonji was stopped, Hartge checked four and three vehicles, respectively. (*Id.* at 24, 29). According to Hartge, once a vehicle he has checked is stopped and he verifies that the trooper on the ground flagged over the correct vehicle, it takes him only "a few seconds" to make shorthand notations on his clipboard log and only "a couple of minutes to find another vehicle" as he circles back to the other end of the air speed zone. (*Id.* at 32). In Kalonji's case, Hartge was watching his vehicle "for approximately two minutes, maybe a little less." (*Id.* at 23).

{¶19} Kalonji testified in his defense. According to Kalonji, he is an "engineer by education" and "also a professional truck driver." (*Id.* at 55-56). U.S. Route 24 is a road he travels "a lot." (*Id.* at 56). When Kalonji worked for "the phone company," he worked on moving "a lot of * * * facilities to make this road * * * be a reality as it is." (*Id.*). On July 4, 2015, Kalonji—who resides in Fort Wayne, Indiana—was driving his French nephew to Maryland. (*Id.*).

According to Kalonji, he "wasn't in a hurry" and "was not driving that fast." (*Id.*). He continued, "I believe [Hartge] might have observed me going fast but not as fast as seventy six (76) * * *." (*Id.* at 57).

{¶20} Hartge's cross-examination testimony and Kalonji's direct-examination testimony do not weigh against Kalonji's speeding conviction. As we stated above, Hartge was not required to bring his stopwatches to trial. In his cross-examination testimony, Hartge further explained that he verified that the stopwatches properly calculated the speed of the dark vehicle. He explained that he watched Kalonji's vehicle for no more than two minutes and that it took only a few seconds to note Kalonji's stop on his clipboard. Therefore, Kalonji's argument that it was not "humanly possible" for Hartge to check the number of vehicles he did in the minutes before and after Kalonji's stop is baseless, not to mention unsupported by any evidence offered by Kalonji. Moreover, Kalonji's argument that it was not "humanly possible" to remember the details of Kalonji's stop is likewise baseless, especially given that Hartge logs those details. Kalonji's testimony likewise does not weigh against his speeding conviction. Essentially, Kalonji testified that, while he had no reason to go fast that day, he might have been going fast, but not 76 miles per hour. Far from negating the State's evidence, Kalonji's admission that he was "going fast" weighs in favor of the conviction. Accordingly, this is not an exceptional case in which the evidence weighs heavily

against the conviction. The trier of fact did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See Barnes*, 2010-Ohio-987, at ¶ 12-21; *Makuch*, 2012-Ohio-5272, at ¶ 26-27; *Rice*, 2000 WL 1369924, at *4-5.

**{¶21}** Kalonji's first and fifth assignments of error are overruled.

## Assignment of Error No. II

**The trial court erred in allowing the testimony of the citation-issuing officer.**

## Assignment of Error No. III

**The trial court erred in allowing for evidence testimony that Pilot trooper did not provide to the court:**
  1. **Any proof showing stop watches used**
  2. **Calibration data for said stop watched [sic]**
  3. **His flight plan in speed, altitude, distance from target, direction.**
**Furthermore the trial court erred in failing to show that this case could be presented without any evidence of equipment used.**

## Assignment of Error No. IV

**The trial court erred in admitting into evidence a video recording that the citation-issuing trooper presented.**

**{¶22}** In his second, third, and fourth assignments of error, Kalonji argues that the trial court erred in allowing certain evidence. As to Kalonji's second and third assignments of error, he failed to object to this evidence in the trial court. Therefore, he waived for appeal all error but plain error. *Missler*, 2015-Ohio-1076, at ¶ 49, citing *State v. Brooks*, 3d Dist. Defiance No. 4-08-09, 2008-Ohio-

6188, ¶ 12. Moreover, he failed to comply with App.R. 16(A)(7), which requires that he include in each assignment of error an argument explaining "the reasons in support of the contentions, with citations to the authorities, statutes, and part of the record on which appellant relies." Kalonji's brief is devoid of reasons in support of his second and third assignments of error, and he fails to cite relevant authorities or parts of the record on which he relies. An appellate court may disregard an assignment of error under App.R. 12(A)(2) "if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)." *See State v. Markley*, 3d Dist. Marion No. 9-14-39, 2015-Ohio-1890, ¶ 55. We elect to do so in this case and overrule Kalonji's second and third assignments of error.

{¶23} Under his fourth assignment of error, Kalonji argues that the trial court erred by admitting into evidence the video of Kalonji's traffic stop, as recorded by McClain's patrol vehicle. Kalonji objected to its admission at trial, and he appears to argue on appeal that the trial court should not have admitted the video because it is irrelevant. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Generally, the admission or exclusion of evidence lies within the

trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice." *State v. Bower*, 3d Dist. Shelby No. 17-14-14, 2015-Ohio-1889, ¶ 13, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶24} The trial court did not abuse its discretion in admitting the traffic-stop video. As the State correctly points out, the video corroborates, among other things, Hartge's and McClain's versions of the events and that McClain stopped the correct vehicle. As we noted above, Hartge testified that he observed a "dark vehicle" exceeding the speed limit and watched McClain flag it over on Hartge's command. The video shows that the vehicle stopped by McClain—a black 2015 Chrysler minivan—fits the "dark vehicle" description given by Hartge. (State's Ex. 1). Hartge also testified that he observed the dark vehicle pass a silver vehicle while in the air speed zone. The video depicts a silver vehicle trailing the dark vehicle as McClain flagged over the dark vehicle. (*Id.*). Therefore, the video has a tendency to make the existence of the speeding violation and correctly identified vehicle more probable than it would be without the video. Accordingly, the trial court did not abuse its discretion in admitting the video. Based on our conclusion that the trial court did not abuse its discretion in admitting the video, we conclude

that Kalonji's due-process rights were not violated by the admission of the video, to the extent Kalonji makes that argument in this appeal. *See State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 98 (12th Dist.).

{¶25} Kalonji's fourth assignment of error is overruled.

{¶26} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**