[Cite as *State v. Warner*, 2021-Ohio-4183.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO.  9-21-14

    v.

JULIA M. WARNER,                        O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Marion County Common Pleas Court
Trial Court No. 2020CR0345

**Judgment Affirmed**

**Date of Decision:  November 29, 2021**


APPEARANCES:

    *Lisa M. Tome* **for Appellant**

    *Andrea K. Boyd* **for Appellee**

Case No. 9-21-14

**PER CURIAM.**

{¶1} Defendant-appellant, Julia Warner ("Julia"), brings this appeal from the April 16, 2021, judgment of the Marion County Common Pleas Court sentencing her to twenty-four months in prison after she was convicted in a bench trial of "Leaving the Scene of an Accident/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1)/(B)(2)(b),[1] a fourth degree felony, and "Tampering with Evidence/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a third degree felony. On appeal, Julia argues that there was insufficient evidence presented to convict her, that her convictions were against the manifest weight of the evidence, that the trial court's general findings of guilt constituted a legal impossibility, and that the trial court committed repeated, cumulative errors depriving her of a fair trial.

*Background*

{¶2} On June 4, 2020, just after midnight, the record indicates that Julia Warner was driving a black Jeep Wrangler southbound on SR 203 with her husband, Jason Warner ("Jason"), in the passenger seat. At the same time, Colton G. was driving northbound on SR 203 in a BMW X3. As both vehicles approached CR

---

[1] Pursuant to R.C. 4549.02(B)(1), a person who violates R.C. 4549.02(A) is guilty of "failure to stop after an accident." However, in the indictment the State titled the crime "Complicity to Leaving the Scene of an Accident." In addition, the trial court used the terminology "Leaving the Scene of an Accident/Complicity" in its final judgment entry. Notably, the Supreme Court of Ohio has colloquially called a violation of R.C. 4549.02 "leaving the scene of an accident." *State v. Bryant*, 160 Ohio St.3d 113, 2020-Ohio-1041, ¶ 2. We will use the terms interchangeably in this opinion.

-2-

106, also known as Somerlot Hoffman Road, Julia attempted to make a left turn onto CR 106 without yielding to Colton's vehicle. The Warners' Jeep Wrangler struck the left front of Colton's BMW, causing the BMW to travel off the right side of the road and strike a utility pole. The wreck resulted in serious damage to Colton's vehicle and trapped him, semi-conscious, inside.

{¶3} Some nearby residents in the rural area heard the crash and saw a male and female—the Warners, who were not known to the witnesses—walking around the crash site and looking into the damaged BMW. Julia was observed to have her hand over her mouth by one witness. Shortly thereafter, the witnesses saw the black Jeep Wrangler drive away from the scene of the accident prior to the arrival of law enforcement.

{¶4} One of the nearby witnesses approached the scene after the Jeep Wrangler left and saw that Colton's vehicle was smoking and noisy. Colton himself was trapped in his vehicle, bloody, and semi-conscious. One witness called 911 and emergency services responded. Colton had to be extracted from his vehicle with a "hydraulic spreader," also known as the "jaws of life," before being taken to the hospital.

{¶5} Meanwhile, the Warners went home, leaving marks in the roadway and their driveway where the vehicle's rim was scraping the pavement through a deflated tire. A neighbor of the Warners was out walking and heard their vehicle

making a lot of noise coming up the street. He saw the Warners' Jeep pull into their garage and close the door, though the neighbor did not see who was driving.

{¶6} The Warners did not contact anyone regarding the accident until approximately nine hours later, when they approached law enforcement together to accept responsibility for the accident. At that time, and over the ensuing weeks, Julia made multiple statements indicating that she was driving during the accident, that she thought there was a stop sign in the other direction, and that she misjudged the turn in the dark and the rain. When law enforcement investigated the matter, virtually all of the evidence pointed to Julia driving at the time of the crash, such as the bruising on her body consistent with the driver's-side seatbelt, her DNA on the driver's-side airbag, and Jason's DNA on the passenger's-side airbag. As for his part, Jason initially told a coworker that he had basically been "passed out" or "asleep" through the whole incident, though he later acknowledged to the same coworker that he had gotten out of the Jeep Wrangler at the scene, as other witnesses had claimed.

{¶7} On September 9, 2020, a joint indictment was filed against Jason and Julia alleging that they had each individually committed Complicity to Vehicular Assault in violation of R.C. 2923.03(A)(2) and R.C. 2903.08(A)(2)(b), a felony of the fourth degree (Count 1); Complicity to Vehicular Assault in violation of R.C. 2923.03(A)(2), R.C. 2903.08(A)(2)/(b), and R.C. 4549.02(A)(1), a felony of the

third degree (Count 2); Complicity to "Leaving the Scene of an Accident" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1), a felony of the fourth degree (Count 3); and Complicity to Tampering with Evidence in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a felony of the third degree (Count 4).[2] Jason and Julia pled not guilty to the charges. They also waived a jury trial and elected to proceed to a bench trial, with a visiting judge assigned to preside over the matter.

{¶8} Prior to trial, the parties entered into a number of stipulations, which included the authenticity of various lab reports, photographs, medical records, phone records, etc.[3] In addition, the Warners also agreed to stipulate that Colton suffered serious physical harm as a result of the accident, obviating the need for testimony from a significant number of medical professionals.

{¶9} The Warners' bench trial was held March 8-10, 2021. Importantly, the two charges for Complicity to Vehicular Assault against Jason were dismissed, though Vehicular Assault charges remained pending against Julia as the driver of the vehicle at the time of the accident.[4] At the conclusion of the trial, the trial court noted that it did not have to provide any reasoning to support its general findings;

---

[2] The indictment was amended to correct typos and incorrect numbers in portions of code sections.
[3] The Warners also waived any objections to proceeding to trial together after the issue was raised by the State.
[4] The State requested the dismissal of Complicity to Vehicular Assault charges against Jason after a review of the evidence and after speaking with the witnesses in preparation for trial. The State was satisfied that Julia was driving at the time of the crash, thus the State also requested the removal of "Complicity" language from her Vehicular Assault charges. The State's requests were not opposed and they were granted.

nevertheless, the trial court made some statements regarding the evidence on the record. Ultimately, the trial court found Julia and Jason guilty of Count 3 of the indictment, "Leaving the Scene of an Accident/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1)/(B)(2)(b), a fourth degree felony, and Count 4 of the indictment, "Tampering with Evidence/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a third degree felony.

{¶10} As for the remaining charges pending against Julia, the trial court found Julia not guilty of both counts of Vehicular Assault, reasoning that while she may have been negligent in causing the accident, she was not reckless, as exhibited by her speed at the time of the crash (roughly 12 or 13 mph). Nevertheless, the trial court initially stated that Julia was guilty of the "lesser-included offense" of Negligent Assault, despite no requests for any lesser-included offenses to be considered by either party. Although the trial court made this initial "finding" regarding lesser-included offenses, at sentencing the trial court subsequently withdrew the findings of guilt regarding-lesser included offenses and did not convict Julia of Negligent Assault, reasoning that an additional element was actually required to establish Negligent Assault. Thus Julia was entirely acquitted of the Vehicular Assault charges and no convictions were ever journalized regarding any purported lesser-included offenses.

{¶11} Following the findings of guilt against the Warners, but prior to sentencing, the Warners filed written, renewed motions for acquittal. They had previously made motions for acquittal during the trial. The Warners took issue with many of the trial court's factual "findings" and legal conclusions that led to the general findings of guilt.

{¶12} On April 14, 2021, the matter proceeded to sentencing; however, prior to sentencing the Warners, the trial court addressed the Warners' renewed motions for acquittal finding that defense counsel was mischaracterizing the evidence and/or the trial court's statements related to the evidence. The trial court further analyzed the evidence, explained its general findings, and overruled the Warners' motions for acquittal. The trial court also filed a written entry denying the renewed motions for acquittal for the reasons stated on the record.

{¶13} The trial court then proceeded to sentencing solely on Counts 3 and 4 of the indictment, ordering Jason and Julia to both serve eighteen months in prison for "Leaving the Scene of an Accident/Complicity," and twenty-four months in prison for "Tampering with Evidence/Complicity." Those prison terms were ordered to be served concurrently, so Jason and Julia each received a twenty-four-month prison term. A judgment entry memorializing Julia's sentence was filed April 16, 2021. It is from this judgment that Julia now appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court's verdict was not supported by sufficient evidence as the State failed to prove the elements of the charged offenses thereby violating Appellant's Due Process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provision of the State Constitution.**

**Assignment of Error No. 2**
**Appellant's convictions were against the manifest weight of the evidence in violation of her right to Due Process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 3**
**The trial court's guilty verdicts constituted a legal impossibility, were contrary to law, and violated Appellant's rights to Due Process and to a fair trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

**Assignment of Error No. 4**
**Appellant was deprived of a fair trial by the cumulative errors of the trial court in violation of her right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.**

*First Assignment of Error*

{¶14} In her first assignment of error, Julia argues that there was insufficient evidence presented to convict her of "Leaving the Scene of an Accident/Complicity" and "Tampering with Evidence/Complicity."

Standard of Review

{¶15} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*,

163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 7. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

Controlling Statutes

{¶16} In this case, Julia was convicted of a violation of R.C. 4549.02(A)(1)/(B)(2)(b), and a violation of R.C. 2921.12(A)(1), both by means of being Complicit pursuant to R.C. 2923.03(A)(2).

{¶17} Revised Code 4549.02(A)(1)/(B)(2)(b) (Failure to Stop After an Accident or, as styled here, "Leaving the Scene of an Accident") reads as follows:

> **(A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:**

> **(a)   Any person injured in the accident or collision;**
>
> **(b)    The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;**
>
> **(c)    The police officer at the scene of the accident or collision.**
>
> **\* \* \***
>
> **(B)(1) Whoever violates division (A) of this section is guilty of failure to stop after an accident. Except as otherwise provided in division (B)(2) or (3) of this section, failure to stop after an accident is a misdemeanor of the first degree.**
>
> **(2)   If the accident or collision results in serious physical harm to a person, failure to stop after an accident is whichever of the following is applicable:**
>
> **\* \* \***
>
> **(b)   If the offender knew that the accident or collision resulted in serious physical harm to a person, a felony of the fourth degree.**

Revised Code 2921.12(A)(1) (Tampering with Evidence) reads as follows:

> **(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:**
>
> **(1)   Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]**

Julia was alleged to commit the above crimes via Complicity, which as charged in this case is codified in R.C. 2923.03(A)(2).  This provision, and other relevant provisions of the Complicity statute, read:

**(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:**

**\* \* \***

**(2) Aid or abet another in committing the offense[.]**

**\* \* \***

**(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.**

**\* \* \***

**(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.**

Evidence Presented

{¶18} The record indicates that on the evening of June 3, 2020, Julia and her husband Jason went to the residence of Todd and Kimberly Anderson for a social gathering. The Warners and the Andersons were very close friends, and had been for years. Kimberly Anderson was having a female friend visit from out-of-town, so she was hosting a gathering that Julia was attending. Jason was planning on attending a separate social gathering with Todd that evening.

{¶19} The Warners arrived at the Andersons' residence around 6:00 p.m. At that time, Todd Anderson was not home. However, shortly after Todd arrived home around 6:30 p.m., Todd and Jason left the Andersons' residence and went to their

own social gathering at the home of Rob Lust. Todd, Jason, Robb, and others were part of a group planning a "cigar smoker," a cigar-related event. (Tr. at 223). While at Rob Lust's home, Todd had a few drinks and he thought Jason might have had a drink but Todd was unsure. Regardless, Todd and Jason returned to the Andersons' residence between 11:30 and 11:45 p.m.

{¶20} Meanwhile, at the Andersons' residence, Julia and Kimberly were drinking wine and snacking. Julia admitted to having three drinks throughout the evening, claiming that her last drink was at 9:30 or 10 p.m. Kimberly's guests at the social gathering, other than Julia, left around 10-10:30 p.m. Julia stayed at the Andersons' residence until Jason returned with Todd. At that time, the Warners left together, with Julia driving the black Jeep Wrangler they owned. The Warners' home was approximately a 15-20 minute drive.

{¶21} On the ride home, Julia was driving south on SR 203 approaching an intersection with CR 106, also known as Somerlot Hoffman Road. The area was relatively rural. Julia slowed down to make the turn onto Somerlot Hoffman Road from 25 mph to 12 or 13 mph. However, she failed to yield to a driver coming north on SR 203 before she made her turn. Julia would later claim that she thought there was a stop sign in the opposite direction, and, alternatively, that she misjudged the turn in the dark and rain. Regardless of the reason, the Warners' vehicle struck a BMW X3 being driven by Colton G. The collision caused Colton to veer off the

road into a telephone pole. Colton's vehicle was seriously damaged to the point that the engine compartment on the left side was shifted toward the passenger compartment. (State's Ex. 23). Colton was trapped inside the vehicle.

{¶22} Jennifer Mehaffey resided at 2815 Larue Prospect Road South approximately 185 yards south of the crash intersection. At the time of the crash, Jennifer's daughter, Ashtan, and her boyfriend, Marquis, were on the front porch of the residence. Marquis saw Colton's silver vehicle drive past the residence, then he heard the crash at the intersection. Marquis stated he did not have a clear view of the intersection from the porch due to the angle.

{¶23} When he heard the crash, Marquis stepped off the porch and moved toward the intersection. As he did, he saw two people outside of the damaged vehicles: a woman who had her hands to her face looking into the silver crashed vehicle, and a man. Ashtan testified that she also saw a male and a female outside of the crashed vehicles.

{¶24} Ashtan notified her mother Jennifer of the incident, who was upstairs when it happened, and Ashtan called 911. Jennifer came outside and saw someone circling the damaged vehicle, although she thought she saw a male get out of the driver's side of the Jeep and get into the passenger side of the Jeep Wrangler.

{¶25} Seeing the male and female together at the crash site from a distance, Marquis thought that the two must be exchanging information from the accident,

and that they had the situation handled, so he changed direction and began walking back toward the porch. However, shortly thereafter, the Jeep Wrangler left the scene of the accident and the individuals were gone. When Marquis realized that both individuals from the scene were gone, yet one vehicle was still present, he ran to the damaged vehicle.

{¶26} Another individual, Keith Bentley, lived slightly closer to the rural intersection where the accident occurred, but to the north of it, and he also heard the crash. At the time of the crash, Keith was sitting in his living room watching television when he heard a "loud pop." (Tr. at 64). He went to his door and saw two vehicles, one of which had struck the pole on his property. The pole was approximately 85 yards away from Keith at that time.

{¶27} Keith walked out of his house to the southern portion of his driveway and he saw a male figure walking around the crashed vehicle. Keith went back into his house to get flashlights and a raincoat, but as he did, the Jeep Wrangler left the scene. Keith did not see a second person at the crash site, and he did not see who was driving when the Jeep Wrangler departed.

{¶28} After the Jeep Wrangler left the scene of the accident, Marquis, Jennifer and Keith went to the area of the crash to check on the other vehicle. When Marquis arrived, he saw the driver of the crashed vehicle bleeding, with the airbags deployed. Marquis indicated that the vehicle was noisy and smoking from the front.

Marquis and Keith both asked the driver some questions, but according to them, the driver was not making sense. Keith described Colton as "very disoriented." (Tr. at 70).

{¶29} Jennifer was a nurse, so she got into Colton's vehicle and helped stabilize Colton's head/neck until emergency services responded. Upon arrival, emergency services noted that Colton was trapped in the vehicle, that he was semi-conscious, had a large "goose egg" on his head, and that Colton did not know the place and time. (Tr. at 123). Firefighters employed a "hydraulic spreader" to extricate Colton from the vehicle. He was taken to Marion General Hospital, but he had to be transferred to another hospital because Marion General was not a trauma hospital.

{¶30} Shortly after the crash, past midnight on June 4, 2020, David Bailey was walking around his cul-de-sac to deal with medical issues. He lived near the Warners. Despite the fact that he was wearing headphones and listening to music, he heard a very loud noise approaching and saw a black Jeep Wrangler coming up his road. According to him, the vehicle was making "all kinds of noise." (Tr. at 126). He stressed that it was "[r]eal loud[.]" (*Id.*) David watched the Jeep Wrangler pull into the Warners' garage and the garage door closed behind it. David did not see who was driving the vehicle.

{¶31} According to testimony, the Warners' residence was approximately 5.5 miles from the crash site. The Warners made no calls and sent no text messages regarding the accident over the next 8 hours.

{¶32} At 8:06 a.m. on June 4, 2020, Jason sent a text message to an employee at the Marion County Common Pleas Court stating that he had a personal issue that he had to deal with and that he would not be at work. Jason was an elected common pleas court judge. He asked if another judge could cover his docket for the day.

{¶33} Around 9:30 a.m. on June 4, 2020, Jason and Julia willingly went to the police to report the accident and were transferred to the Ohio State Highway Patrol, which was handling the crash investigation. Jason and Julia met with Marion Post Commander Troy Sexton of the State Highway Patrol. At that time, Julia admitted she was driving the vehicle during the crash. She filled out a written statement indicating that she thought there was a stop sign in the other direction and that after the crash she panicked and drove away. When questioned by Commander Sexton, Julia denied being impaired at the time of the crash, though she admitted to having three drinks that night, ending as late as 10 p.m.

{¶34} Commander Sexton testified that he did not give Julia a field sobriety test during the interview because he did not feel she was impaired at the time of the interview. He also did not administer a blood test because there was a time restriction on law enforcement wherein they were expected to get any alcohol or

drug results after a crash and they were past the time limit. (Tr. at 198). However, the Warners gave law enforcement permission to go to their residence and inspect the Jeep, collect evidence, and take DNA samples.

{¶35} At 12:47 p.m. that same day, Jason sent a text message to the other elected judge of the Marion County Common Pleas Court, and to some of the staff members of the court. The text stated that Jason and Julia had been in a "pretty serious car accident." (State's Ex. 46). Jason stated that Julia failed to yield and hit another vehicle, and that, "in a hysterical panic, [she] drove away from the scene of the accident. After a long discussion that went on throughout the night, we agreed that we needed to go in and report it, which we did this morning." (*Id.*)

{¶36} On the same day that the Warners reported the accident, law enforcement officers went to the Warners' residence to take pictures of their damaged Jeep Wrangler. The Jeep was in the garage when officers arrived, and after they took initial photographs, they asked Jason to back the Jeep out of the garage. Jason did so, with some difficulty.[5] One officer noted that the damage to the driver's-side front tire would have made the vehicle extremely difficult to drive. Testimony indicated that the "rim ha[d] been separated from the tie rod end underneath the fender well." (Tr. at 205). Photographs of the Warners' Jeep showed extensive damage to the left front wheel, including a deflated tire. There was also

---

[5] Officers on the scene did not notice if Jason moved the seat or not prior to backing the vehicle out of the garage.

"buckling * * * on the left front fender above the wheel well." (State's Ex. 23). Due to the deflated tire, there were marks in the road and in the driveway leading to the Warners' garage from where the rim had scraped the asphalt. There were additional marks made when the vehicle was pulled out of the garage.

{¶37} With the Warners' permission, law enforcement officers collected the airbags that had deployed from the vehicle. DNA samples were taken from each airbag. DNA consistent with Julia's was found on the driver's-side airbag, and DNA consistent with Jason's was found on the passenger's-side airbag. Julia also had bruising consistent with the driver's-side seatbelt. Once officers were done with the vehicle, it was towed to Buckeye Collision.

{¶38} The next day, June 5, 2020, Jason returned to work. That day, he had a meeting scheduled with the other Marion County Common Pleas Court Judge, Judge Edwards, about court matters unrelated to the crash. Following the meeting, Judge Edwards asked to speak with Jason privately about the accident, because the local chief of police had indicated that Jason might have been the driver of the vehicle in the crash, which was contrary to what Jason had said in his text message to Judge Edwards.

{¶39} Jason denied being the driver, and told Judge Edwards that he was "passed out" when the collision occurred. (Tr. at 433). According to Judge Edwards, after Jason said the words "passed out," it "was almost like his tongue

came out of his mouth and tried to grab the words and pull them back in. And [Jason] said instead that he was asleep. [Jason] said: Well, you know, asleep." (*Id*.)

{¶40} Jason told Judge Edwards that he was awakened by the impact, that he recalled looking up and seeing his wife bleeding from her nose, and that he then remembered the sound of the Jeep Wrangler pulling off. Judge Edwards indicated that it left him with the impression that Jason was sleeping through most of the incident. Further, Judge Edwards testified that he felt that was the impression Jason wanted him to have from the conversation.

{¶41} Later that same day, Judge Edwards went to Buckeye Collision to check on a vehicle he was having restored there. While there, he saw the Warners' Jeep Wrangler in the parking lot, which he was familiar with. Judge Edwards was "shocked" at the damage, especially to the driver's side front wheel. (Tr. at 437). It caused him to question how Jason could have been asleep. He also noticed the airbags had been removed from the vehicle, and he sent Jason a text message to ask who had removed them, thinking that it could be tampering with evidence if Jason had done it, but the airbags had been removed by law enforcement.

{¶42} In the week following the accident, Colton was released from the hospital. However, he was having significant memory issues that required him to stay with his family. While Colton was staying with his family, and not present at the apartment he rented, a letter was dropped off that was written by Julia

apologizing for the accident. She stated she was very sorry, that she did not want Colton to think she was "crazy, or drunk, or insensitive." (State's Ex. 41). She stated that it was not like her to misjudge a turn in the dark and the rain, and that it was not like her to "freak out" and "panic and leave[.]" (*Id.*)

{¶43} From June 9, 2020, to June 17, 2020, Julia and Jason went on a pre-scheduled vacation with the Andersons to Texas. According to the Andersons, the accident was never discussed.

{¶44} On June 19, 2020, just over two weeks after the accident, a televised news story aired about the crash. The story contained information that witnesses in the area of the accident saw a man exit the Jeep Wrangler at the crash site. Judge Edwards saw the news story and sent a text message to Jason about it because Jason had not indicated he had gotten out of the Jeep at the scene previously. Rather, Jason had left Judge Edwards with the impression that he had been sleeping. When asked by Judge Edwards, Jason acknowledged getting out of the Jeep. Judge Edwards asked Jason if Jason had informed disciplinary counsel about the incident, and Jason responded that he did not think he had done anything wrong.

{¶45} Over the ensuing months, Colton went through physical therapy and had various medical issues including memory problems, a concussion, a kidney tear, cellulitis, knee/walking problems, and bell's palsy. The parties stipulated at trial that he suffered serious physical harm as a result of the accident.

Analysis

**{¶46}** At the outset of our review of sufficiency of the evidence, we note that many of Julia's arguments in her brief related to sufficiency of the evidence challenge specific statements the trial court made on the record explaining its "reasoning" before entering its general finding that Jason and Julia were guilty of Counts 3 and 4 in the indictment. Importantly, and as the trial court noted before making those statements, there *is no obligation whatsoever for the trial court to make factual findings or to express its reasoning that led to the general finding.* *State v. Ham*, 3d Dist. Wyandot No. 16-09-01, 2009-Ohio-3822, ¶ 37.

**{¶47}** Rather, pursuant to Crim.R. 23(C), in a trial without a jury, the court "shall make a general finding." This Court has repeatedly expressed, in varying circumstances, that anything stated beyond the required "general finding" of guilt or innocence in a criminal bench trial is " 'mere surplusage without legal significance.' " *State v. Ham*, 2009-Ohio-3822 at ¶ 37, citing *State v. Crawford*, 10th Dist. Franklin No. 85AP-324, 1986 WL 1715 at *7 ("Therefore, *sub judice,* the trial court should only have entered findings of guilty based upon the evidence. Separate findings of fact and conclusions of law are neither countenanced nor permitted. Therefore, we find the trial court's reasoning as mere surplusage without legal significance sufficient to impeach the general findings of guilt."); *see also State v. Fisher*, 3d Dist. Auglaize No. 2-10-09, 2010-Ohio-5192, at fn 2 ("We note

that the trial court issued written findings of fact in this case, which is contrary to the directive contained in Crim.R. 23. When a bench trial is held, the court is to make a general finding; i.e. guilty or not guilty."); *State v. Kalonji*, 3d Dist. Paulding No. 11-15-07, 2016-Ohio-991 at fn. 3 ("Because the trial court's purported findings of fact are mere surplusage, the trial court's use of an erroneous date—August 26, 2015 rather than July 4, 2015—has no bearing on our disposition of this appeal.").

{¶48} Other Ohio Appellate Courts have also indicated that anything beyond a trial court's general finding in a criminal bench trial constitutes "surplusage" without legal significance. *See State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶¶ 41-42; *Crawford, supra*; *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 26; *State v. Singleton*, 2d Dist. Montgomery No. 27916, 2019-Ohio-1477, ¶ 18; *but see State v. Ndiaye*, 10th Dist. Franklin No. 19AP-10, 2020-Ohio-1008, ¶ 30, appeal not allowed, 159 Ohio St.3d 1437, 2020-Ohio-3634 (indicating that a trial court's comments made *after* a general finding of guilt were surplusage, but if the comments or statements were made before a general finding of guilt the comments may not be surplusage).

{¶49} Thus based on the authority, we could overrule Julia's challenges to the trial court's statements as those challenging mere surplusage without legal significance. However, completely notwithstanding this point, we review the sufficiency of the evidence on appeal in the light most favorable to the

prosecution to examine whether the evidence would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). We are not tasked with reviewing any specific statements of the trial court in a sufficiency review, regardless of whether the statements are categorized as "findings" or "surplusage." Rather, we must look at the evidence.

{¶50} Thus turning to the evidence presented in this matter, we must determine whether the evidence supports Julia's convictions for Complicity to Failure to Stop After an Accident and Complicity to Tampering with Evidence.

{¶51} The evidence is largely undisputed that prior to the crash Julia was driving. Further, Julia admitted to failing to yield to Colton's vehicle, causing the accident in question. She also stipulated that Colton suffered serious physical harm. In addition, she acknowledged that she left the scene despite causing the accident, and there is no dispute that the Warners' Jeep Wrangler was driven back to the Warners' residence, removing it from the scene and preventing law enforcement from conducting an immediate investigation. Thus Julia essentially admitted to all elements of the crimes she was charged with, with the exception of the elements of Complicity.

{¶52} In this case, Julia was convicted of Complicity through "aiding and abetting." "To support a conviction for Complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). Furthermore, "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id*. quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 57 O.O.2d 38, 41 (1971).

{¶53} Julia's primary argument on appeal is that she was convicted of *Complicity* to Failure to Stop After an Accident and *Complicity* to Tampering with Evidence even though, she claims, that the evidence only establishes that she was the *principal actor*. According to her, she could not be convicted of Complicity as there was no evidence that she aided or abetted anyone else.

{¶54} Notably, the Complicity statute itself states, "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F). This would seem to directly undermine Julia's argument; however, to circumvent the wording of the statute, Julia argues that while the statute "allows for the charge of complicity to be stated as complicity or as the principal offense * * *

[t]here is no support for the opposite * * * that * * * in a complicity trial, [] one may be convicted as a principal." (Appt.'s Br. at 12).

{¶55} In support of her argument, Julia cites *State v. Woods*, 48 Ohio App.3d 1 (1st.Dist. 1988), and *State v. Gray*, 5th Dist. Delaware No. 99CAA10047, 2000 WL 1262593. In *Woods*, the First District Court of Appeals found that a trial court erred by giving a jury instruction on Complicity where the evidence only showed that the defendant acted as a principal offender or an accessory after-the-fact. In *Gray*, the Fifth District Court of Appeals determined that a defendant could not have been convicted of complicity for aiding and abetting another "since the evidence adduced at trial only supported a finding that appellant acted as the principal offender rather than an aider or abetter." *Gray* at *3.

{¶56} In citing the above cases as support for her argument that the evidence was insufficient to convict her of *Complicity* to Failure to Stop After an Accident and *Complicity* to Tampering with Evidence, Julia presumes that it was conclusively established that she was the driver of the Jeep Wrangler *after* the crash, and that the evidence could only be interpreted that she was the post-collision driver. While it was largely undisputed that she was driving *prior* to the crash, as verified by independent evidence, not one person testified to seeing who was driving the Warners' Jeep after the crash.

{¶57} The evidence did show that the Jeep was driven from the scene, that it was damaged, and that it was likely hard to control. We know that the Jeep was making a lot of noise. We know that Julia *claimed* to be the post-accident driver to law enforcement (she did not testify at trial). Circumstantially, there was also testimony from law enforcement that the condition of the Jeep after the collision would have rendered the vehicle extremely difficult to drive. And, we also know that Jason backed the Jeep out of the garage for law enforcement half a day later. What we do not know for a certainty is that Julia was the post-accident driver. Thus Julia's assertion that she could *only* be the principal for post-accident leaving the scene and tampering with evidence is not conclusively established by the evidence.

{¶58} With this in mind, it is important to emphasize that the State did not have to prove that Julia was the post-accident driver, or for that matter, that Jason was the post-accident driver, in order to sustain the convictions in this case. The State "need only prove that *a* principal committed the offense," and that was done here. (Emphasis added.) *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 37, citing *State v. Perryman*, 49 Ohio St.2d 14, 27 (1976). The State established that the vehicle was driven, and someone had to be driving it, regardless of who it was. There were only two individuals in the vehicle.

{¶59} Moreover, separate from the issue of the uncertainty of the post-collision driver, some of the testimony could have been used to establish Julia

"inciting" Jason to commit a crime, which would establish Complicity in this matter. According to Shirley S., Jason claimed one day at work that when Julia and Jason were walking around the crash site, Julia "was yelling [at Jason] to get back in the car. And [Jason] thought – and it was raining, and [Jason] thought, well [sic] get back in the car and they would call 911. But when he got back in the car Juli[a] took off in a panic. And he kept yelling at her to stop but she kept going." (Tr. at 419). If Jason's statements are believed at all, and they are questionable, particularly given that he could have called 911 in the car or as soon as he got home, then Julia was inciting him to get back into the vehicle and leave the crash site. Moreover, Jason and Julia then went back to their residence and discussed the matter for approximately eight hours before then "deciding" to come in and report the accident. As stated previously, conduct and companionship before *and after* an event can be used as evidence of intent. *Johnson*, *supra*.

{¶60} Given all of the evidence that was presented, and Julia's relative admissions to the elements of Failure to Stop After an Accident and Tampering with Evidence, we find that there was sufficient evidence presented for a reasonable factfinder to determine beyond a reasonable doubt that Julia was guilty of Complicity to both crimes. Therefore, Julia's first assignment of error is overruled.

*Second Assignment of Error*

**{¶61}** In her second assignment of error, Julia argues that even if there was sufficient evidence presented to convict her, her convictions were against the manifest weight of the evidence.

Standard of Review

**{¶62}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, " 'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier-of-fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

{¶63} In her second assignment of error, Julia broadly and summarily contends that her convictions were against the manifest weight of the evidence for the same reasons she argued that there was insufficient evidence to convict her. More specifically, she argues that there was *no* evidence that she committed acts that would constitute aiding and abetting.

{¶64} Again, Julia ignores the fact that the evidence simply does not conclusively establish the identity of the post-collision driver of the Jeep Wrangler. Further, there was evidence to support Julia and Jason acting in Complicity, particularly since they looked into Colton's vehicle together, then got back into the Jeep Wrangler, then left the scene together, then went back home and admittedly discussed the matter all night before "deciding" to report the accident. Given the deference afforded to trial courts in determining credibility, we cannot find that the factfinder clearly lost its way or created a manifest miscarriage of justice. This is not the "exceptional" case warranting reversal. Therefore, Julia's second assignment of error is overruled.

*Third Assignment of Error*

{¶65} In Julia's third assignment of error, she contends that the trial court's determination that both of the Warners were guilty of Failure to Stop After an Accident and Tampering with Evidence via Complicity constituted a legal

impossibility. More specifically, she summarily argues, in the absence of any legal authority, that there were only two individuals who could have been the principal offenders and that by convicting each defendant of Complicity, the trial court effectively found that both individuals were principal actors and both were aiders and abettors.

{¶66} First, we note that Julia's argument hinges largely on challenging not only her conviction, but also Jason's conviction. It is unclear, at best, to what extent she would have standing to do so. "The issue at trial was not the absent principal's guilt, but rather the appellant's guilt." *State v. Graven*, 52 Ohio St.2d 112, 116 (1977).

{¶67} Second, and notwithstanding the first point, as noted earlier the Complicity statute itself *directly addresses the situation where there is no convicted principal*. Pursuant to R.C. 2923.03(B), "It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."

{¶68} Essentially Julia is arguing that she cannot be convicted of Complicity if her husband is not the principal offender. However, even if Jason had been acquitted of being a principal or being complicit, Julia *still* could have been convicted of Complicity because there is no requirement for the conviction of a principal offender under the statute. *See also*, *Graven*, *supra*. Again, the State

"need only prove that *a* principal committed the offense," and that was done here. (Emphasis added.) *State v. Singleton*, 8th Dist. Cuyahoga No. 98301, 2013-Ohio-1440, ¶ 37, citing *State v. Perryman*, 49 Ohio St.2d 14, 27 (1976).

**{¶69}** Given the plain statement in the Complicity statute, and Julia's failure to cite any legal authority that would compel us otherwise, we cannot find that her convictions constituted a legal impossibility. Therefore, Julia's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶70}** In her fourth assignment of error, Julia argues that she was deprived of a fair trial by what she claims were the cumulative errors of the trial court.

Standard of Review

**{¶71}** "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶¶ 222-224 and *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). " 'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.' " *State v. Stober*, 3d

Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

Analysis

**{¶72}** In her fourth assignment of error, Julia enumerates six issues that she felt established that the trial court erred. She contends that altogether, if not individually, these "errors" constituted cumulative errors meriting reversal.

**{¶73}** In her first two claimed errors, Julia argues that the trial court erred by convicting her of a "purported lesser[-]included offense which was not sought by either party and was a legal impossibility," and that the trial court sought to correct its error by "omitt[ing]" the lesser-included offense "findings" from the judgment entry. (Appt.'s Br. at 19). Importantly, there *simply are no convictions for any lesser-included offenses in this matter*. Any initial comments or findings by the trial court regarding lesser-included offenses were specifically withdrawn by the trial court and thereby nullified. As a result, there are no journalized convictions other than pertaining to Counts 3 and 4 as originally charged in the indictment.

**{¶74}** In fact, the trial court specifically addressed the lesser-included offenses matter at the sentencing hearing, indicating that the trial court was not going to enter judgment on any lesser-included offenses because, after researching the matter, the trial court felt that Negligent Assault contained an additional element that Vehicular Assault did not contain. Julia was then *entirely acquitted* of the first

two counts in the indictment. Based on what occurred in this case, there can be no error here, or any prejudice *at all*, because any issue regarding Negligent Assault was already corrected by the trial court.

{¶75} Next, Julia argues that the trial court erred by finding Julia guilty of "Tampering with Evidence, an unindicted offense." This argument references "surplusage" stated by the trial court and ignores the fact that the trial court specifically stated, "For all these reasons, and all of the other reasons in the record, the Court finds both Defendants guilty of Count 3 and Count 4 [of the indictment]." (Tr. at 538). The trial court thus directly found Julia guilty of Counts 3 and 4 and the indictment, which was reiterated in the judgment entry. There is no error here with the trial court purportedly finding Julia guilty of Tampering with Evidence instead of the indicted "Complicity to Tampering with Evidence," or any resulting prejudice.

{¶76} Next, Julia also reiterates her issues with the trial court's purported misunderstanding of witness testimony "which it used to justify its verdict." (Appt.'s Br. at 19). Throughout her brief, Julia repeatedly challenges the trial court's statements made prior to announcing the general finding of guilt. We again refer to the "surplusage" law stated in the first assignment of error. Completely notwithstanding the surplusage point, however, we note that Julia's arguments often cherry-pick statements of the trial court or read them out of context to suit her

claims. For example, Julia strongly challenges the trial court's statement that "there was conflicting testimony – and I think perhaps maybe this is the State's theory, I don't know, in charging aiding and abetting. There is evidence that Jason Warner was driving [after the accident]." (Tr. at 529). The trial court also later stated, "I think it's more likely that Jason Warner drove away" because the vehicle would be "extremely difficult for a woman to control the operation of that [damaged Jeep.]" (Tr. at 532).

{¶77} Julia argues that these statements are unsupported by the evidence. However, taking these statements alone and out-of-context ignores other more definite statements wherein the trial court states: "Now, whether – whichever one drove it, it doesn't matter for aiding and abetting purposes, because you can be charged as the principal offender, or as an aider and abettor."[6] (Tr. at 530). Further, the trial court found, after discussing who may have driven the vehicle, "In any event, the Court finds beyond a reasonable doubt that they aided or abetted in the commission of the offense of leaving the scene of the accident." (*Id*. at 533). Finally, the trial court stated, "For all these reasons, *and all of the other reasons in the record*, the Court finds both Defendants guilty of Count 3 and Count 4." (*Id*. at 538).

---

[6] Notably, the State did argue in closing that reasonable minds could differ as to who drove the Jeep from the crash site. The State questioned whether Julia was strong enough, noted that Jason quickly volunteered to move the Jeep when law enforcement asked, and law enforcement testified the vehicle would be very difficult to move/direct.

{¶78} Notably, because of the Warners' challenges to the trial court's statements made prior to the general findings of guilt, and because of the Warners' renewed motions for acquittal prior to sentencing in this matter, the trial court again addressed its statements from the trial at the sentencing hearing. At that time, the trial court said, *inter alia*, "The Court does not know – and as I said – for sure, who was driving [after the accident]. All the Court can say is that based on the law and the evidence, they acted in concert with one another." (April 14, 2021, Tr. at 28). Thus Julia's references in her brief to isolated statements such as the one that it was "more likely" that Jason was driving ignore the fact that the trial court stated it was ultimately irrelevant who was driving based on the finding the trial court made. Further explanations like this establish that Julia's attempt to randomly pick statements made by the trial court, without viewing everything in its entirety, is problematic. Thus even if the comments were not "surplusage," the trial court clarified its findings and we see no prejudicial error here because the appropriate general findings were made and they were supported by the evidence.

{¶79} Julia next argues that the trial court's guilty findings constituted a legal impossibility, reiterating her claim from the third assignment of error. We have already rejected this claim. Thus we find no error, and no prejudice.

{¶80} Finally, Julia argues that the trial court failed to consider the elements of Complicity when convicting her of the indicted offenses on Counts 3 and 4.

Again, the trial court specifically found Julia guilty of Counts 3 and 4 of the indictment as stated at the conclusion of the trial and in the final judgment entry. We see no error here and no prejudice as there is no indication that the trial court was unaware of the indicted offenses.

{¶81} Because we have not found multiple errors in this matter, the doctrine of cumulative error does not apply. *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 104, citing *State v. Bertuzzi*, 3d Dist. Marion No. 9-13-12, 2014-Ohio-5093, ¶ 110. Therefore, Julia's fourth assignment of error is overruled.

## Conclusion

{¶82} For the foregoing reasons Julia's assignments of error are overruled and the judgment and sentence of the Marion County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, J., MILLER, J., and SHAW, J., concur.**

**/jlr**